FILED

AUG 3 0 2012

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

POSTED ON WEBSITE

NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

In re                                          Case No. 10-19719-A-7

ROBERT A. PUTNAM,

        Debtor.
_____/

KELLIE M. McFADDEN,                            Adv. No. 10-01261-A

        Plaintiff,

    vs.

ROBERT A. PUTNAM,

        Defendant.
_____/

**MEMORANDUM DECISION FOLLOWING TRIAL ON
NONDISCHARGEABILITY OF PARTICULAR DIVORCE-RELATED DEBTS**

John Bianco, Esq., of the Bianco Law Firm, appeared on behalf of the plaintiff Kellie McFadden.

Scott Lyons, Esq., of the Law Offices of Scott Lyons, appeared on behalf of the defendant Robert

Putnam.

    Before the court is a complaint filed under Rule 4007[1] in an adversary proceeding

initiated by the plaintiff Kellie McFadden ("McFadden") against her former spouse, the

defendant-debtor Robert Putnam ("Putnam"), seeking declaratory relief that certain debts

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037, as enacted and promulgated after October 17, 2005, the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA), Pub. L. No. 109-8, 119 Stat. 23 (enacted Apr. 20, 2005).

assigned to Putnam under a dissolution judgment are excepted from discharge under §§ 523(a)(5) and (a)(15). On May 4, 2012, the court held a trial on the matter, where both parties, represented by their own counsel, presented their arguments, testimony, and evidence. After the filing of post-trial briefs, the court took the matter under submission on May 31, 2012. For the reasons set forth below, the court finds that these debts under the dissolution judgment—to the extent they represent Putnam's obligations enforceable by and payable to McFadden—are nondischargeable.[2]

## I.  FACTUAL BACKGROUND.

McFadden and Putnam were married in May 1997. Their union produced two children, both still minors. Prior to their separation, Putnam was a self-employed businessman, operating the corporation R.A. Putnam Financial & Insurance Services ("Putnam Financial"). Though not much was presented at trial about this business, McFadden did describe Putnam Financial as being always profitable. However, the parties agreed that the income from the business fluctuated from month to month. It appeared that Putnam's income in 2010 fluctuated as well; sometimes he was earning up to $5,000 a month but was averaging roughly $3,000 in monthly income according to his bankruptcy schedules and statements. Apparently, in addition to his salary, Putnam Financial was also paying for Putnam's personal expenses in at least one year. Other than these limited facts presented at trial, Putnam's financial situation remains somewhat unclear. And as to McFadden, the record is silent as to her employment status and her income-earning power during this relevant period.[3]

Their marriage ended in July 2009 when the two separated and McFadden filed for divorce in the Tulare County Superior Court (the "State Court").[4] After a lengthy dissolution

---

[2] This memorandum decision contains the court's findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a), as made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7052.

[3] The only relevant facts presented at trial regarding McFadden's financial condition were that she was entitled to spousal support and that her two children were entitled to child support since she obtained primary custody of them after the dissolution.

[4] *Putnam v. Putnam*, Case No. 09-233613 (Cal. Super. Ct., Tulare Cnty., Visalia Div. 2009).

2

1    process, the State Court entered two judgments on May 6, 2010.  The first was the Judgment of

2    Dissolution of Marriage[5] (the "First Judgment"), which incorporated the first of the parties'

3    marital settlement agreements entitled Stipulation for Judgment to Be Taken[6] (the "First

4    Incorporated MSA").  This judgment dealt primarily with the division of the parties' assets and

5    liabilities.  The second judgment was the Judgment on Reserved Issues[7] (the "Second

6    Judgment"), which incorporated the Stipulation and Order for Entry of Judgment,[8] the other

7    marital settlement agreement (the "Second Incorporated MSA").  In contrast to the First

8    Judgment, the second mainly resolved the parties' issues on domestic support and custody.

9    Together, these two judgments represented the parties' comprehensive agreement regarding the

10   dissolution of their marriage, the division of property, and the issue of domestic support

11   (collectively, the "Dissolution Judgment").  Relevant to this proceeding are four of Putnam's

12   obligations incorporated into the Dissolution Judgment:

13       A. Putnam's Obligation to Make Monthly Lease Payments.

14          Among the parties' community debts before their separation was a vehicle lease with

15   GMAC for a 2007 GMC Yukon Denali (the "Denali"), in which both McFadden and Putnam

16   remained liable for any obligations under the lease.  After making one last payment in March

17   2010, Putnam ceased making payments on the lease entirely.  At that point, the monthly lease

18   obligation amounted to $1,272.89, with the lease set to expire on October 24, 2010 and with

19   eight monthly payments still remaining.

20          As part of the First Incorporated MSA, McFadden obtained possession of the leased

21   Denali as her separate property.  Yet, pursuant to the Second Incorporated MSA, Putnam was

22   ordered—"[i]n lieu of spousal support"—to continue making the monthly payments on the lease,

---

[5] Plaintiff's Trial Exhibit 1, at 1–2 (identified as "Judgment of Dissolution of Marriage").

[6] Plaintiff's Trial Exhibit 1, at 3–22 (identified as "Stipulation for Judgment to Be Taken").

[7] Plaintiff's Trial Exhibit 3, at 1–2 (identified as "Judgment on Reserved Issues").

[8] Plaintiff's Trial Exhibit 3, at 3–16 (identified as "Stipulation and Order for Entry of Judgment on Child Support, Spousal Support, Child Custody, Child Visitation and Disposition of Petitioner's Vehicle").

as well as paying the vehicle insurance premiums on the Denali through October 24, 2010, the date of the lease's termination. Putnam's lease obligation under the Dissolution Judgment was actually a continuation of a prior interim order from the State Court entered on July 31, 2009[9] (the "July Interim Order"). After October 24, 2010, Putnam was no longer responsible for paying McFadden's vehicle insurance. His monthly lease payments also ended on this date with the expiration of the lease. However, the Second Incorporated MSA imposed an additional financial obligation upon Putnam. Beginning November 2010, Putnam was required to make spousal support payments to McFadden in the amount of $750 a month through March 2011 and then $500 a month beginning the next month.[10]

   Though Putnam was obligated under the Dissolution Judgment to make the lease payments to GMAC on McFadden's behalf, he failed to make the eight remaining payments. As a result, the Denali was repossessed on August 4, 2010, with less than three months left on the lease's term. At that time, the outstanding balance due to GMAC on the lease was $10,895.33.[11] On December 9, 2011, through a collections agent, GMAC demanded payment from Putnam for the balance, which GMAC had calculated to be $10,036.61. Currently, it is unclear whether GMAC has made further demands from Putnam or whether it has ever demanded payment from McFadden.

   B. Putnam's Obligation to Make the Down Payment for McFadden's New Vehicle.

   Also, as part of the First Incorporated MSA, Putnam was ordered, "upon expiration of the Denali lease, [to] pay the sum of $2,200.00 directly to the auto dealership of [McFadden's] choosing as down payment assistance for a future vehicle for [McFadden]."

   Realizing that Putnam was not making the lease payments and anticipating the impending repossession of the Denali, McFadden obtained a 2010 Chevrolet Traverse from the dealership

---

[9] Plaintiff's Trial Exhibit 10 (identified as "Findings and Order After Hearing" (filed Jul. 31, 2009)).

[10] Under the First Incorporated MSA, Putnam was already ordered to make monthly child support payments beginning on August 1, 2009.

[11] This amount consisted of eight monthly payments of $1,272.89 each, $32.00 in late charges, and $680.21 in other unpaid charges.

4

1   Richard's Chevrolet of Corcoran ("Richard's Chevrolet") on July 31, 2010, before the October

2   expiration of the Denali lease. With permission from her father Steven McFadden ("Steven")

3   and with the knowledge of the dealership, McFadden executed the vehicle purchase agreement in

4   her father's name, where McFadden printed and signed the agreement as "Steven McFadden."

5       Not having demanded or received the $2,200 down payment assistance from Putnam,

6   McFadden could not put any money down, and the entire $31,585.85 purchase price for the

7   vehicle had to be fully financed by a lender. The vehicle finance agreement was also executed in

8   Steven's name but without the lender's knowledge about McFadden's arrangement with her

9   father and the dealership. Though the title for the vehicle and the accompanying loan appear to

10  be in Steven's name, McFadden nevertheless maintains that the vehicle is hers.

11      C.  Putnam's Obligation to Pay McFadden's Attorney's Fees.

12      Next, under the First Incorporated MSA, Putnam was obligated to pay $10,000 for

13  McFadden's attorney's fees, paid directly to her attorney, Dale Bruder ("Bruder"). This

14  provision incorporated a prior order entered on December 31, 2009 by the State Court[12] (the

15  "December Interim Order"). Specifically, pursuant to this order, Putnam was required to "pay

16  [McFadden's] counsel $2,500.00 today [on December 31, 2009], and $500.00 per month

17  beginning January 1, 2010 and continuing on the first of each month thereafter until the full

18  $10,000.00 sum has been paid." The First Incorporated MSA further provided that upon full

19  payment of these attorney's fees, Putnam was "required to pay one-half of the total costs of

20  tuition for the children's continued attendance at St. Paul's School." If Putnam had followed the

21  payment schedule from the December Interim Order, the final $500 payment to Bruder would

22  have become due in March 2011, and Putnam's subsequent obligation to pay tuition expenses

23  would have begun the following month.

24      However, Putnam did not pay the entire amount of attorney's fees as required. He made

25  the initial $2,500 payment and the next two monthly payments of $500, paying off only $3,500 of

26  his $10,000 obligation to Bruder. At the time that Putnam filed his bankruptcy petition, the

27

28  [12] Plaintiff's Trial Exhibit 5 (identified as "Findings and Order After Hearing" (filed Dec. 31, 2009)).

5

1  remaining $6,500 balance was still outstanding.

2        In addition to the $6,500 owed by Putnam, Bruder was also entitled to a substantial

3  amount of attorney's fees from McFadden for representing her in the dissolution. Steven, on

4  behalf of his daughter, decided to pay the remainder of attorney's fees owed to Bruder, including

5  the Putnam's $6,500 portion. Steven made the payment directly to Bruder based on an

6  understanding with McFadden that she would later repay him the amount advanced on her

7  behalf. That payment occurred subsequent to the date of Putnam's bankruptcy filing but prior to

8  the date of the nondischargeability trial.

9      D. <u>Putnam's Obligation to Pay a Family Loan Owed to McFadden's Father</u>.

10        Also among the parties' community debts was a family loan owed to Steven for $15,000.

11  This debt was described simply as a "business debt" without any other details. As part of the

12  property division set out in the First Incorporated MSA, Putnam agreed to accept this debt "as his

13  sole and separate debt[ ] without any offset or equalization being owed to him from the

14  community for his acceptance." In addition to assuming the family loan obligation as his own

15  debt, Putnam also "agree[d] to save and hold [McFadden] harmless from any and all liability for

16  [this] obligation[ ]." Other than stating that Putnam would owe Steven $15,000, the MSA did

17  not spell out any other material terms regarding repayment, such as the frequency and amount of

18  payments, the interest rate, or the duration for repayment.

19        As of the petition date, Putnam has not repaid any of this $15,000 debt to Steven.

20  Additionally, Steven has not pursued collection of this debt from his daughter for the outstanding

21  balance, either by lawsuit or otherwise.

22  **II. PROCEDURAL HISTORY.**

23        On August 24, 2010, Putnam filed a petition under chapter 7.[13] In his Schedules, he

24  included GMAC, Bruder, Steven, and McFadden as creditors holding claims against him.

25  Putnam listed GMAC as having a $10,000 secured claim, Bruder with a $6,500 unsecured claim,

26  Steven with a $15,000 unsecured claim, and McFadden with a $2,200 unsecured claim.

27

28  [13] *In re Putnam*, Case No. 10-19719-A-7 (Bankr. E.D. Cal. Aug. 24, 2010).

In October 2010, with Putnam's bankruptcy case pending and with the automatic stay in effect, McFadden sought to enforce the provisions of the Dissolution Judgment in the State Court. However, the State Court declined to allow her enforcement to proceed, unsure whether the automatic stay under § 362, the discharge injunction under § 524, or both prevented McFadden from enforcing those debts provided for in the judgment.

Undeterred, on November 2, 2010, McFadden initiated the instant adversary proceeding by filing a complaint seeking declaratory relief that three of Putnam's obligations under the Dissolution Judgment—(1) the lease payments for the Denali, (2) the $2,200 down payment assistance, and (3) the remaining $6,500 balance for attorney's fees—were nondischargeable under § 523(a)(5) as domestic support obligations.[14]  Following in her steps, on November 18, 2010, Steven also filed an adversary complaint against Putnam,[15] seeking to have the $15,000 debt owed to him declared nondischargeable under § 523(a)(5) or § 523(a)(15).

In response to the complaints, Putnam filed motions to dismiss both adversary proceedings, both of which were subsequently granted by the court.  In Steven's adversary proceeding, his complaint was dismissed without allowing him leave to amend.  The court concluded that Steven had no standing to assert nondischargeability claims under either § 523(a)(5) or § 523(a)(15).  As to McFadden, though the court dismissed her complaint, she was nevertheless granted leave to amend her complaint.

McFadden then filed her first amended complaint on March 10, 2011.  In this complaint, she repleaded the three claims from the original complaint and added a new claim seeking the nondischargeability of the family loan to her father.  McFadden maintained that these four debts were nondischargeable under subsection (a)(5) or, in the alternative, under subsection (a)(15).

While McFadden's adversary proceeding was pending, Putnam received his discharge on June 7, 2011.  However, his bankruptcy case remains open, pending the outcome of this

---

[14] *McFadden v. Putnam (In re Putnam)*, Case No. 10-19719-A-7, Adv. No. 10-01261-A (Bankr. E.D. Cal. Nov. 2, 2010) [hereinafter *McFadden I*].

[15] *McFadden v. Putnam (In re Putnam)*, Case No. 10-19719-A-7, Adv. No. 10-01276-A (Bankr. E.D. Cal. Nov. 18, 2010) [hereinafter *McFadden II*].

1   adversary proceeding.

2       On May 4, 2012, this matter came on for trial.  At the trial, the parties presented evidence

3   and offered their own live testimony.  After the parties filed closing briefs, the court took the

4   matter under submission on May 31, 2012.

5   **III.  JURISDICTION.**

6       The court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11

7   U.S.C. § 523, and General Order Nos. 182 and 330 of the U.S. District Court for the Eastern

8   District of California.  This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).  Venue is

9   proper under 28 U.S.C. § 1409.

10  **IV.  ISSUES PRESENTED.**

11      A.  Whether McFadden holds bankruptcy claims against Putnam related to his obligations to

12  third-party creditors under the Dissolution Judgment that would make her the real party in

13  interest in this nondischargeability action.

14      B.  Whether the court can consider facts coming into existence after the petition date for

15  nondischargeability purposes.

16      C.  Whether Putnam's debts to McFadden related to his lease, down payment, attorney's

17  fees, and family loan obligations under the Dissolution Judgment are nondischargeable as

18  support debts under § 523(a)(5) or as other divorce-related debts under § 523(a)(15).

19      D.  Whether McFadden's nondischargeability claim related to Putnam's family loan

20  obligation is barred by the doctrine of claim preclusion.

21      E.  Whether McFadden's nondischargeability claims are barred by the doctrine of unclean

22  hands.

23  **V.  DISCUSSION.**

24      "Except as provided in [§ 523 of the Bankruptcy Code]," a discharge under chapter 7

25  "discharges the debtor from all debts that arose before the [petition date]."  § 727(b).  Section

26  523, in turn, sets forth various kinds of debts that are excepted from the discharge.  *See* §§

27  523(a)(1)–(19).  Relevant in this matter are §§ 523(a)(5) and (a)(15), two mutually exclusive

28  avenues for a former spouse of a debtor to object to the dischargeability of certain divorce-related

debts. *Compare* § 523(a)(5), *with* § 523(a)(15) (excepting from discharge only debts that are "not of the kind described in [§ 523(a)(5)]"). Specifically, subsection (a)(5) excepts from discharge debts for domestic support obligations, while subsection (a)(15) makes nondischargeable other, non-support-related debts that arose in connection with a divorce, otherwise referred to as property settlement obligations.

In a nondischargeability proceeding, the creditor bears the burden of proving by a preponderance of the evidence that a particular debt is excepted from discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). Typically, the goal of providing a "fresh start" to the debtor requires that nondischargeability exceptions be narrowly construed in favor of the debtor. *See Quarre v. Saylor (In re Saylor)*, 108 F.3d 219, 221 (9th Cir. 1997) (citations omitted). However, at the same time, the court must recognize "an overriding public policy favoring the enforcement of familial obligations." *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir. 1984) (citations omitted); *see also In re Marriage of Clements*, 134 Cal. App. 3d 737, 743–44 (1982) (noting that "the family law court has a strong interest in requiring the bankrupt to fulfill obligations that are an indivisible part of the equal division of community property").

A. McFadden Is the Real Party in Interest in an Action Requesting that Putnam's Obligations Owed to Her Be Deemed Nondischargeable.

Before addressing the merits of McFadden's nondischargeability claims under §§ 523(a)(5) and (a)(15), the court first considers one of Putnam's principal arguments, that McFadden is an improper party in this action. Putnam contends that the debts alleged by McFadden to be nondischargeable are all debts owed to other third-party creditors, rather than being owed to her. According to Putnam, this means that McFadden cannot be the proper plaintiff to assert nondischargeability claims against him. The court construes this to be question of whether McFadden is a real party in interest in this action under Federal Rule of Civil Procedure 17.

Civil Rule 17 states, "An action must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a), *incorporated by* Fed. R. Bankr. P. 7017. "This rule requires that the party who brings an action actually possess, under the substantive law, the right sought to be

enforced." *Carter v. Brooms (In re Brooms)*, 447 B.R. 258, 265 (B.A.P. 9th Cir. 2011) (citations omitted) (internal quotation marks omitted); *cf. First Fed. Bank of Cal. v. Cogar (In re Cogar)*, 210 B.R. 803, 808 n.7 (B.A.P. 9th Cir. 1997) ("To have standing a party must assert its own legal rights and interests and cannot rest its claim to relief on the legal rights or interest of third parties."). "'The modern function of the rule . . . is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata.'" *U-Haul Int'l, Inc. v. Jartran, Inc.*, 793 F.2d 1034, 1039 (9th Cir. 1986) (quoting Fed. R. Civ. P. 17 advisory committee's note (1966 Amendment)). Thus, to decide if a plaintiff is the real party in interest, the court turns to the relevant substantive statutes to see whether they provide the plaintiff with a cause of action that then forms the basis of her action. *Id.* at 1038.

In a § 523 action, the "right sought to be enforced" is the right to have a particular debt be declared nondischargeable. It follows that, in order to bring such action, § 523 "calls for a 'creditor' holding a 'debt' or 'claim' [against the debtor] that 'is owed' to that 'creditor'" as a preliminary threshold. *Blixseth v. Blixseth (In re Blixseth)*, 459 B.R. 444, 456 (Bankr. D. Mont. 2011); *see also* Fed. R. Bankr. P. 4007 ("A debtor or any *creditor* may file a complaint to obtain a determination of the dischargeability of any debt." (emphasis added)); 9 Collier on Bankruptcy ¶ 4007.02, at 4007-2 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012) ("The right to bring a proceeding under Rule 4007 turns upon the right to enforce collection of the debt which is at issue."). Thus, for McFadden to be considered the real party in interest, she must first be a "creditor" holding a bankruptcy "claim" against Putnam, which she can then allege to be nondischargeable in this action. McFadden's real party status will turn on how these statutory terms are defined.

Looking to the Bankruptcy Code, a "creditor" means an "entity that has a *claim* against the debtor." § 101(10) (emphasis added). Turning to what constitutes a "claim" or "debt," the Code views these two terms as being "coextensive, flip sides to the same coin." *In re Egebjerg*, 574 F.3d 1045, 1049 (9th Cir. 2009) (citations omitted) (internal quotation marks omitted). A "debt" is defined as a "liability on a claim," § 101(12), while a "claim" means a "right to

10

1   payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed,

2   contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured," §

3   101(5)(A). Alternatively, a "claim" may be a "right to an equitable remedy for breach of

4   performance if such breach gives rise to a right to payment, whether or not such right to an

5   equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed,

6   undisputed, secured, or unsecured." § 101(5)(B). And as the Supreme Court has previously

7   stated, "The plain meaning of a 'right to payment' is nothing more nor less than an enforceable

8   obligation." *Pa. Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559 (1990), *superseded by*

9   *statute on other grounds*, Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, 104

10  Stat. 2865, *as recognized in Johnson v. Home State Bank*, 501 U.S. 78 (1991).

11          Putnam is, indeed, correct in pointing out that the relevant debts expressly provided under

12  the Dissolution Judgment are obligations directly payable to third-party creditors, not to

13  McFadden. Putnam was ordered to make lease payments directly to GMAC, the down payment

14  to a dealership (later designated as Richard's Chevrolet by McFadden), the payments for

15  attorney's fees to Bruder, and the repayment of the family loan to Steven. Arguably, because

16  Putnam's debts were owed to third parties, those third parties—but not McFadden—were

17  Putnam's creditors, who held claims against Putnam in his bankruptcy. Since McFadden, but not

18  those third-party creditors, is the plaintiff in this action, this may present an issue for her. The

19  court cannot consider the nondischargeability of Putnam's debts to such third-party creditors here

20  given that these creditors are not plaintiffs in this action and have not ratified McFadden to

21  represent their interests under Civil Rule 17. *See Bulman v. Bulman (In re Bulman)*, 123 B.R.

22  24, 27–28 (Bankr. E.D. Va. 1990) (allowing wife to prosecute nondischargeability of attorney's

23  fees debt against husband under § 523(a)(5) after attorney had ratified wife as acting on his

24  behalf). *But see Fair Oaks Dodge v. Skinner (In re Skinner)*, 175 B.R. 613, 615 (Bankr. E.D. Va.

25  1994) (reasoning that both non-debtor spouse[16] and third-party creditor were real parties in

26  _____

27  [16] Any reference to a "non-debtor spouse" in this decision is intended to mean a spouse who has not filed
    bankruptcy, which may include a spouse who remains liable on a debt to a third-party creditor but has not
28  filed bankruptcy.

1    interest in § 523(a)(5) action).

2         That Putnam's obligations are payable to third parties, however, does not end this

3    discussion. McFadden may still hold her own claims against him. *See Wodark v. Wodark (In re*

4    *Wodark)*, 425 B.R. 834, 838 (B.A.P. 10th Cir. 2010) ("The fact that the underlying obligation

5    was payable to [a third-party creditor] does not mean that [the debtor spouse] did not incur a

6    separate obligation to [the non-debtor spouse] that is, in itself, a nondischargeable debt."). To

7    determine whether McFadden, in fact, has any rights to payment or to an equitable remedy that

8    can be enforced against Putnam, the court must turn to state law. *See In re Hassanally*, 208 B.R.

9    46, 49 (B.A.P. 9th Cir. 1997) ("Absent an overriding federal interest, the existence of a claim in

10    bankruptcy is generally determined by state law." (citing *Butner v. United States*, 440 U.S. 48,

11    54–55 (1979))); *Hazelton v. Hazelton (In re Hazelton)*, 304 B.R. 145, 154 (Bankr. M.D. Pa.

12    2003) ("It is well established that, absent an overriding federal provision, both the creation and

13    enforceability of obligations imposed in connection with orders entered in divorce proceedings

14    are governed by state law." (citing *Grogan v. Garner*, 498 U.S. 279, 283–84 (1991))). Here,

15    since Putnam's obligations arise under a Dissolution Judgment enforceable under California law,

16    the court relies primarily on the California Family Code, sections 1–20043, as the applicable

17    statutes that may establish McFadden's claims in bankruptcy.

18         *1. Putnam's Obligation to Hold McFadden Harmless from Liability on the Family Loan*

19                *Obligation Constitutes a Claim Held by McFadden.*

20         The court begins with Putnam's obligation to repay the family loan to Steven but notes

21    that the court is not determining whether Putnam's obligation to repay Steven on the $15,000

22    family loan is nondischargeable in this action. That obligation is not one owed to McFadden.

23    Rather, for purposes of this action prosecuted by McFadden, the court only considers Putnam's

24    express duty under the Dissolution Judgment to hold McFadden harmless from liability on the

25    family loan obligation assigned to Putnam.

26         Where a dissolution judgment "obligates the debtor to indemnify the spouse and hold the

27    spouse harmless from debts incurred during the marriage, courts recognize that the obligation to

28    the spouse is separate from the original debt." *Heilman v. Heilman (In re Heilman)*, 430 B.R.

213, 223 (B.A.P. 9th Cir. 2010) (Pappas, J., dissenting) (citations omitted). Such hold harmless obligations are a typical part of assigning debts for purposes of a property division. Under California law, a right to be held harmless is a subspecies of indemnification rights. *See Queen Villas Homeowners Ass'n v. TCB Prop. Mgmt.*, 149 Cal. App. 4th 1, 9 (2007) ("'Hold harmless' is defensive: The right not to be bothered by the other party itself seeking indemnification." (emphasis omitted)). And a right to indemnification, though contingent on the petition date, constitutes a claim for bankruptcy purposes. *See Emps.' Ret. Sys. of Haw. v. Osborne (In re THC Fin. Corp.)*, 686 F.2d 799, 802–03 (9th Cir. 1982); see also § 101(5) (defining "claim" as "right to payment, whether or not such right is . . . contingent"). Thus, Putnam's obligation to hold McFadden harmless from any liability on the family loan obligation constitutes a separate claim held by McFadden.

> *2. McFadden, as the Benefitted Spouse, Has the Right to Enforce the Lease Payments, Down Payment, and Payment of Attorney's Fees in State Court.*

Unlike the family loan obligation, the other relevant obligations are not associated with any express hold harmless provisions under the Dissolution Judgment. The court must therefore determine if McFadden can rely on any other state law to enforce the obligations relating to the lease, the down payment, and the attorney's fees, in the absence of a hold harmless provision.

Under California law, the state court may order that one spouse pay the other spouse's attorney's fees and debts, made payable to the other spouse, as a means of providing spousal support. *See, e.g.*, Cal. Fam. Code §§ 272, 2023, 2030. The California Family Code also permits such obligations can be paid directly to the other spouse's attorney or creditors on behalf of the benefited spouse. For attorney's fees, section 272 provides, "Where the court orders one of the parties to pay attorney's fees and costs for the benefit of the other party, the fees and costs may, in the discretion of the court, be made *payable in whole or in part to the attorney* entitled thereto." Cal. Fam. Code § 272(a) (emphasis added). Then, for other debts, section 2023 states, "On a determination that payment of an obligation of a party would benefit either party or a child for whom support may be ordered, the court may order one of the parties to pay the obligation, or a portion thereof, *directly to the creditor*." Cal. Fam. Code § 2023(a) (emphasis added).

13

In situations where the court has ordered that payments be directed to a third party, the benefited spouse nevertheless maintains the right to enforce such obligations. For those attorney's fees paid to the benefitted spouse's attorney, California Family Code section 272 explicitly allows the benefitted spouse to enforce such obligations, stating that "the order providing for payment of the attorney's fees and costs may be enforced directly by the attorney in the attorney's own name or *by the party in whose behalf the order was made*." Cal. Fam. Code § 272(b) (emphasis added). And as one California court has further explained, "the right to [attorney's] fees and costs belongs to the spouse to whom they were awarded, not to the attorney, even if the award is made directly payable to the attorney."[17] *In re Marriage of Read*, 97 Cal. App. 4th 476, 480 (2002) (citations omitted) (internal quotation marks omitted).

For the other obligations ordered to be paid to the benefitted spouse's creditors, the benefitted spouse's right of enforcement is implied from the applicable statute barring a creditor from enforcing the burdened spouse's obligation. Though payments have been directed to a third-party creditor under a judgment or order, California Family Code section 2023 nevertheless provides that such "creditor has no right to enforce the order made under this section, nor are the creditor's rights affected by the determination made under this section." Cal. Fam. Code § 2023(b). The creditor's only recourse for enforcement of the obligation is under the original instrument that created the burdened spouse's obligation, rather than under the subsequent court order that simply reaffirmed that obligation. *See Pinson v. Cole*, 106 Cal. App. 4th 494, 496 (2003). By precluding the creditor from enforcing the order, the statute leaves the benefitted spouse, the only other party to the dissolution, with the right to enforce the burdened spouse's obligation.

Thus, pursuant to these California statutes, it appears that McFadden has rights to enforce Putnam's obligations under the Dissolution Judgment relating to the lease, the down payment,

---

[17] The attorney subsequently may have that right but only after the entry of a final order or judgment. *See In re Marriage of Green*, 143 Cal. App. 4th 1312, 1321 (2006) ("Entry of a judgment pursuant to Family Code section 272, subdivision (a), making attorney fees payable directly to a spouse's attorney alters this situation by making the attorney a judgment creditor.").

and the attorney's fees in state court.  However, that does not necessarily answer the question of whether McFadden has bankruptcy "claims" against Putnam.

### 3.  McFadden's Rights to Enforce Putnam's Third-Party Obligations Translates into Her Own Potential Rights to Payment.

Revisiting what constitutes a "claim" for bankruptcy purposes, the Code defines a claim, in addition to being a "right to payment," as a "right to an equitable remedy for breach of performance."  § 101(5).  As the benefitted spouse with rights to enforce the obligations to third parties, McFadden, at a minimum, has the right to compel Putnam's specific performance of his obligations under the Dissolution Judgment.  *In re Marriage of Smith*, 21 Cal. App. 4th 100, 106 (1993) (interpreting marital settlement agreement merged into judgment to provide that wife's remedy for enforcing husband's obligation to third party was by specific performance).  Under California law, the remedy of specific performance constitutes an equitable remedy.  *See MacFadden v. Walker*, 5 Cal. 3d 809, 815 (1971); *cf.* Cal. Civ. Code § 3384 (permitting specific performance of an obligation as a form of relief in contract cases).

That McFadden has a right to an equitable remedy is not quite enough.  A right to an equitable remedy for breach of performance will only constitute a "claim" if the breach of performance also "gives rise to a right to payment."  § 101(5)(B); *accord In re Ter Bush*, 273 B.R. 625, 628–29 (Bankr. S.D. Cal. 2002) (concluding that arbitration award for specific performance is not a "claim" for bankruptcy purposes given that "underlying breach . . . does not give rise to the payment of money damages").  At first, it appears on the face of the Dissolution Judgment  that compelling specific performance of Putnam's obligations under the judgment would result in payment to *third-party creditors* but not necessarily to McFadden.  However, McFadden may have rights to payment as well, through the State Court's use of its equitable powers in enforcing the terms of the Dissolution Judgment.

It is true that both of the Incorporated MSAs do not contain any hold harmless provisions applicable to the lease, the down payment, and the attorney's fees obligations, that would allow for payment directly to McFadden.  A marital settlement agreement, on its own, is enforceable as a contract.  *See Flynn v. Flynn*, 42 Cal. 2d 55, 58 (1954).  And as a contract, it is unclear whether

15

McFadden would be entitled to recovery monetary damages. *See Marriage of Smith*, 21 Cal. App. 4th at 106–07 (relying on the Restatement (Second) of Contracts to interpret marital settlement agreement). However, once a marital settlement agreement has been incorporated into a dissolution judgment, the agreement merges into and becomes superseded by the judgment or decree, making available post-judgment remedies. *Id.*

Thus, to enforce her rights, McFadden may rely on California Family Code section 290, which generally provides that "[a] judgment or order made or entered pursuant to [the California Family Code] may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary." This statute gives the state court broad discretion in fashioning orders enforcing family law judgments. *Cal-W. Reconveyance Corp. v. Reed*, 152 Cal. App. 4th 1308, 1318 (2007). As a result, a court has the equitable power to determine the manner in which an obligation under a dissolution judgment is to be paid or performed. *See Cnty. of Santa Clara v. Wilson*, 111 Cal. App. 4th 1324, 1326 (2003); *In re Marriage of Trainotti*, 212 Cal. App. 3d 1072, 1075 (1989). And this would include the "power to order a spouse to pay money or deliver property into the hands of a third party." *In re Marriage of Fithian*, 74 Cal. App. 3d 397, 402 (1977).

Based on the latitude of the state court's discretion in how it may enforce a dissolution judgment, it appears that McFadden could enforce the Dissolution Judgment and then be awarded monetary damages by an order of the State Court as a result of Putnam's failure to perform under the judgment. Such an "award of money damages" payable directly to McFadden would be within the State Court's equitable powers in fashioning an appropriate order, and this would establish her potential rights to payment.

McFadden's potential rights to payment from the State Court are also supported by the limitation placed on the court's discretionary and equitable powers. In enforcing an obligation arising under a dissolution judgment pursuant to California Family Code section 290, the state court cannot retroactively modify any obligations that are already past due which would effectively forgive such obligations. *See In re Marriage of Sabine M.*, 153 Cal. App. 4th 1203,

16

1214 (2007) (citing *Keck v. Keck*, 219 Cal. 316, 320–21 (1933)).  In this case, the State Court would be prohibited from forgiving Putnam's obligations relating to the lease, down payment, and attorney's fees, obligations that have become due after his failure to follow an established schedule.  Putnam is still liable for those obligations, and the state court must enforce them in some manner, such as by ordering that payment be made to McFadden rather than to the third-party creditors.  In doing so, this would provide McFadden with rights to payment.

That McFadden has potential rights to payment based on her ability to enforce the judgment is consistent with how other courts have considered the issue and have concluded that the non-debtor spouse maintains a claim against the debtor spouse.  *See, e.g.*, *Wodark*, 425 B.R. at 838–39 ("Because the other spouse may invoke those remedies in domestic court, the spouse's right of enforcement forms the basis for a 'claim.'"); *Shreffler v. Shreffler (In re Shreffler)*, 319 B.R. 113, 120 (Bankr. W.D. Pa. 2004) ("[M]ost courts look to applicable non-bankruptcy law to determine if the spouse has an independent right to enforce the terms of the dissolution decree . . . . If such right exists, then most courts find that the decree of divorce gives rise to a new and distinct obligation." (citation omitted)); *Ruhlen v. Montgomery (In re Montgomery)*, 310 B.R. 169, 180 (Bankr. C.D. Cal. 2004) ("Even if there was no 'hold harmless' language in the Judgment, [the debtor spouse] incurred a debt to [the non-debtor spouse] in connection with the divorce proceeding under California law.").  And such rights to payment as a result of Putnam's breach of the lease, down payment, and attorney's fees obligations becomes the basis for McFadden's claims in this bankruptcy.

> 4.  *McFadden's Claims Are Contingent and Unliquidated, But the Court May Still Determine Whether Her Claims Are Nondischargeable.*

While McFadden has such potential rights to payment against Putnam, they represent

only contingent[18] and unliquidated[19] claims. For several of Putnam's debts to third-party

creditors (e.g., the lease, the attorney's fees,[20] and the family loan), the third-party creditors have

yet to collect their respective unpaid debts from McFadden (for which she remains liable),[21] and

she has not paid them any amount on Putnam's behalf. Thus, these claims remain contingent and

have not triggered Putnam's obligation to pay McFadden since she has yet to suffer any

economic harm (i.e., by repaying the obligations to third-party creditors on his behalf). *See*

*Simon v. Murrell (In re Murrell)*, 257 B.R. 386, 389 (Bankr. D. Conn. 2001) ("The Hold

Harmless Obligation is a *contingent* debt, in that it becomes fixed only at such time as an

Assigned Debt [third-party] creditor begins collection activity against the *Plaintiff* [non-debtor

spouse]." (emphasis in original)).

As to any of Putnam's other obligations, McFadden's rights to payment may have

matured,[22] but they have not been reduced or liquidated to a final judgment or order by the State

---

[18] *See Fostvedt v. Dow (In re Fostvedt)*, 823 F.2d 305, 306 (9th Cir. 1987) (defining a contingent claim as "one which the debtor will be called upon to pay only upon the occurrence of happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor" (citation omitted) (internal quotation marks omitted)).

[19] *See id.* (stating that "whether a debt is liquidated turns on whether it is subject to ready determination and precision in computation of the amount due" (citation omitted) (internal quotation marks omitted)).

[20] As discussed below, the court considers only the operative facts in existence at time of the filing. Under those facts, Bruder had not yet received payment of his attorney's fees from Steven on behalf of McFadden.

[21] Both the First and Second Incorporated MSA did not alter the contractual relationship between McFadden and the third-party creditors. Thus, McFadden remains liable to the third-party creditors on those debts.

[22] For these rights to payment to have matured, McFadden must have necessarily suffered some kind of damages as a result of Putnam's breach of an obligation under the Dissolution Judgment. The court sees two potential claims.
    First, due to Putnam's breach of the lease obligation, McFadden's Denali was repossessed almost three months before the lease's term. As a result, whatever costs associated with obtaining a new vehicle that were incurred by McFadden up until October 24, 2010 (the lease's expiration date) may form the basis for a claim.
    Second, due to Putnam's breach of the down payment obligation, McFadden was unable to make a down payment on a new vehicle and was required to obtain 100% financing. Any financial harm suffered by McFadden would likely constitute another right to payment.

18

1   Court. Since the Dissolution Judgment did not explicitly order payment directly to McFadden on

2   these obligations and no post-judgment orders have been entered by the State Court ordering so,

3   this court declines to decide the particulars of McFadden's rights to payment.[23]  That

4   determination is more appropriate before the State Court, who has the exclusive jurisdiction over

5   these divorce-related issues.[24]  *See Siragusa v. Siragusa (In re Siragusa)*, 27 F.3d 406, 408 (9th

6   Cir. 1994) (finding no abuse of discretion where bankruptcy court deferred to state court in

7   interest of comity over matters relating to divorce and alimony).  The only proper issue to be

8   decided by this court is whether such debts to McFadden are nondischargeable under the

9   applicable bankruptcy laws.  *Cf. Comer v. Comer (In re Comer)*, 27 B.R. 1018, 1022 (B.A.P. 9th

10  Cir. 1983) (determining that bankruptcy court's judgment was proper where it did not purport to

11  liquidate nondischarged debt but only determined that state court judgments were

12  nondischargeable).

13      Though McFadden's claims are contingent and unliquidated, the court may nevertheless

14  decide whether these claims are nondischargeable under the § 523 exceptions.  *See Mullins v.*

15  *Mullins (In re Mullins)*, No. NV-05-1151-MoSMa, 2006 WL 6810972, at *8 (B.A.P. 9th Cir.

16  June 26, 2006) (stating that "[c]ontingent claims can be nondischargeable" and providing that

17  such determination of nondischargeability would not be an advisory opinion); *Miller v. Krause*

18  *(In re Krause)*, 114 B.R. 582, 595 (Bankr. N.D. Ind. 1988) ("Thus, a debt that is contingent may

19  be nondischargeable.").  Even the possibility that McFadden's debts to the third-party creditors

20  could be reduced or eliminated would not change the court's analysis of the dischargeability of

21  Putnam's debts to McFadden, whatever they may ultimately be.  *Id.* (citing *Myrvang v. Myrvang*

22

23  [23] Typically, in nondischargeability actions, the bankruptcy court has the jurisdiction to enter a money judgment where an underlying debt has not been reduced to judgment in the state court. *See Sasson v.*

24  *Sokoloff (In re Sasson)*, 424 F.3d 864, 867–68 (9th Cir. 2005).

25  [24] Federal courts have historically observed that the "whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex*

26  *parte Burrus*, 136 U.S. 586, 593–94 (1890).  This deference is so strong that the courts have carved out a "domestic support exception" that "divests the federal courts of power to issue divorce, alimony, and

27  child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992).  For this court to fix and liquidate McFadden's claims against Putnam in this matter would necessarily involve divorce-related

28  issues and would thus infringe upon the exclusive jurisdiction of the State Court.

1  *(In re Myrvang)*, 232 F.3d 1116, 1119 n.1 (9th Cir. 2000)).

2  　　To review, for McFadden to be the real party in interest in this nondischargeability

3  proceeding, she can only assert and the court can only consider the debts that Putnam owes to

4  her.  As a matter of clarification, the court is not determining whether Putnam's debts owed

5  directly to GMAC, Richard's Chevrolet, Bruder, or Steven are nondischargeable under §§

6  523(a)(5) and (a)(15) at this time.

7  　　Instead, the court has been presented with the following debts or claims in this instant

8  proceeding: Any potential payment or repayment rights *to McFadden* flowing from Putnam's

9  breach of the lease obligations under the Dissolution Judgment and the July Interim Order (the

10 "Lease Debt"),[25] from his breach of the down payment obligation under the Dissolution

11 Judgment (the "Down Payment Debt"), from his breach of the attorney's fees obligation under

12 the Dissolution Judgment and December Interim Order (the "Attorney's Fees Debt"), and from

13 his obligation to hold her harmless from the family loan under the Dissolution Judgment (the

14 "Hold Harmless Debt").  These represent the four debts owed to McFadden that she now seeks to

15 be determined nondischargeable.[26]

16 B.  The Proper Date for Determining the Operative Facts for Purposes of Nondischargeability

17 　　Is the Petition Date.

18 　　Next, the court will consider a timing issue related to the Attorney's Fees Debt.  Under

19 the Dissolution Judgment and December Interim Order, Putnam was obligated to pay

20 McFadden's attorney's fees to Bruder in the amount of $10,000.  Up until the petition date, he

21 had paid $3,500, leaving a $6,500 balance still owing as of the petition date.  Yet, by the date of

22 the nondischargeability trial, Bruder no longer held a claim against Putnam, as the $6,500 debt

23 had been paid off, though not by Putnam.  Rather, it was Steven, acting on behalf of his daughter,

24 _____

25 [25] As discussed above, the court sees two potential claims for McFadden relating to Putnam's lease
   obligation: (1) McFadden's payment to GMAC on behalf of Putnam for the unpaid balance; and  (2) any
26 vehicle-related costs incurred by McFadden as a result of the early repossession.

27 [26] A finding that these debts are nondischargeable will allow McFadden to return to the State Court to
   enforce the Dissolution Judgment and seek damages, if any, against Putnam without violating the
28 discharge injunction.

1  who paid all of outstanding attorney's fees owed to Bruder, including Putnam's $6,500 portion.

2  The McFadden family considered this payment to Bruder to be an advance for McFadden's

3  benefit with an understanding that McFadden would pay her father back in the future.  However,

4  these events occurred after the petition date, which raises the issue of what is the appropriate date

5  for fixing the operative facts subject to a § 523 action.

6         In considering a similar issue, the BAP has held that the facts in existence on the date that

7  the petition is filed, rather than the facts on the date of the nondischargeability hearing, are what

8  govern. *Leppaluoto v. Combs (In re Combs)*, 101 B.R. 609, 614–15 (B.A.P. 9th Cir. 1989); *see*

9  *also Snider v. Tessler (In re Tessler)*, 44 B.R. 786 (Bankr. S.D. Cal. 1984).  "Such a

10  determination is consistent with the policy of using the filing date as a 'guidepost' in establishing

11  a party's rights in bankruptcy." *In re Combs*, 101 B.R. at 615.  Along with the principle that the

12  petition date fixes the parties' rights, the proper date for determining the operative facts in

13  existence was the petition date. *Id.* at 614.

14         With the date of the filing of Putnam's bankruptcy petition controlling, the court views

15  the operative facts as if no payment had been made to Bruder and Bruder is still owed $6,500

16  from Putnam pursuant to the Dissolution Judgment and December Interim Order.  With Putnam

17  still owing $6,500 in attorney's fees at that time, the fact that McFadden (with the help of her

18  father) retired that debt to Bruder is of no consequence in this proceeding.  Even if those events

19  occurred pre-petition, it would ultimately have little effect on the outcome of the case.  As

20  discussed above, the court is not considering whether Bruder has a nondischargeable claim

21  against Putnam but only whether McFadden has a nondischargeable claim against him.  Under

22  either scenario, McFadden would still have a claim against Putnam for the attorney's fees, though

23  the claim would be contingent in one scenario and matured in the other.[27]

24

25

26  _____

27  [27] In this present scenario (where post-petition facts are not considered), McFadden's claim is only a
contingent claim.  Bruder has yet to collect on the attorney's fees from McFadden.  In the alternative
scenario (where post-petition facts are considered), McFadden's contingent claim has become fixed since

28  the debt has been paid to Bruder on Putnam's behalf.

C.  The Lease, Down Payment, and Attorney's Fees Debts Are Nondischargeable Under §
    523(a)(5).

Turning to the merits of McFadden's pleaded claims for relief under § 523, the court now considers whether the first three debts at issue—the Lease, Down Payment, and Attorney's Fees Debts—are nondischargeable under § 523(a)(5). As previously mentioned, subsection (a)(5) excepts from discharge any debt "for a domestic support obligation." The term "domestic support obligation" is statutorily defined in § 101(14A). Under this Code provision, a "domestic support obligation" is established by four elements, as a debt: (1) "owed to or recoverable by . . . a former spouse . . . of the debtor," § 101(14A)(A); (2) "in the nature of alimony, maintenance, or support . . . of such . . . former spouse . . . without regard to whether such debt is expressly so designated," § 101(14A)(B); (3) "established or subject to establishment before, on, or after the [petition date] by reason of applicable provisions of . . . a separation agreement, divorce decree, [ ] property settlement agreement[, or] an order of a court of record," § 101(14A)(C); and (4) "not assigned to a nongovernmental entity," § 101(14A)(D). To meet her burden under § 523(a)(5), the creditor must demonstrate that the debt at issue satisfies these four elements enumerated in § 101(14A). *Cf. In re Sorah*, 163 F.3d 397, 401 (6th Cir. 1998) (pre-BAPCPA case). Here, as to the three above-mentioned debts, the court finds that McFadden has adequately satisfied the first, third, and fourth elements of § 523(a)(5) (by way of § 101(14A)). It is only the second element that requires a more in-depth discussion.

On the first element, other bankruptcy courts have construed the phrase "a debt . . . owed to or recoverable by . . . a former spouse" to mean that the former spouse may enforce the obligation by further proceedings in the state family court or by a hold-harmless provision the marital settlement agreement. *See, e.g., Hebel v. Georgi (In re Georgi)*, 459 B.R. 716, 719 (Bankr. E.D. Wis. 2011) ("Presumably, 'recoverable' means enforceable by state court procedures."); *Aldrich v. Papi (In re Papi)*, 427 B.R. 457, 464 (Bankr. N.D. Ill. 2010); *In re Poole*, 383 B.R. 308, 313 (Bankr. D.S.C. 2007); *cf. In re Chang*, 163 F.3d 1138, 1141 (9th Cir. 1998) (pre-BAPCPA case) (holding that the "identity of the payee is less important than the

22

1    nature of the debt"). Given the court's clarification above about which claims are a part of this

2    action, the question of whether the Lease, Down Payment, and Attorney's Fees Debts are "owed

3    to or recoverable by" McFadden, the former spouse, can be easily answered in the affirmative.

4    The particular debts subject to a nondischargeability determination are the debts or obligations

5    *owed to McFadden.* Because these claims belong to her and not to any third-party creditor, they

6    clearly constitute debts owed to or recoverable by a former spouse.

7         The third element, that the debt be "established or subject to establishment . . . by reason

8    of applicable provisions of . . . a separation agreement, divorce decree, [ ] property settlement

9    agreement[, or] an order of a court of record" has also been met for the three debts. The court

10   recognizes that, at this time, the only debts specifically established under the Dissolution

11   Judgment are Putnam's payment obligations to third-party creditors, namely GMAC, the

12   dealership, and Bruder. Nevertheless, § 101(14A)(B) allows debts that can also be "subject to

13   establishment" by a post-petition "order of a court of record." McFadden's only method for

14   enforcing Putnam's obligations under the Dissolution Judgment will be in the State Court.

15   There, any payment rights awarded to McFadden would be the result of an "order of a court of

16   record" from the State Court using its equitable powers to enforce the terms of the Dissolution

17   Judgment.

18        As to the fourth element, no evidence was introduced showing that McFadden had

19   assigned her claims to a third party. These claims still remain hers to enforce against Putnam.

20        The only issue in dispute relates to the second element of § 523(a)(5), whether the debts

21   are "in the nature of alimony, maintenance, or support" of the former spouse. This is a question

22   answered by federal law, rather than state law. *Shaver v. Shaver*, 736 F.2d 1314, 1316 (9th Cir.

23   1984) (citations omitted). As the Ninth Circuit has previously explained, "In determining

24   whether an obligation is intended for support of a former spouse, the court must look beyond the

25   language of the decree to the intent of the parties and to the substance of the obligation." *Id.*

26   (citations omitted). Though the question of support is determined under federal law, the

27   bankruptcy court may nevertheless consider how the relevant state law would characterize a

28   particular debt. *In re Chang*, 163 F.3d at 1140.

23

For the substance of an obligation, if its "intended function is to provide a necessity of life, it is ordinarily held to be nondischargeable" as a form of support. *In re Combs*, 101 B.R. at 615–16 (citation omitted); *accord Moberly v. Johnston (In re Moberly)*, 266 B.R. 187, 189 (Bankr. N.D. Cal. 2001). Then, to ascertain the intent of the parties, the BAP has identified several, non-exhaustive factors:

1. The label given to the payments;
2. The context or location of the disputed provision in the decree;
3. The parties' negotiations and understanding of the provision;
4. Whether a lump sum or periodic monthly payments were provided for;
5. The relative earning power of the parties;
6. Whether the recipient spouse would be entitled to alimony under state law;
7. Whether interest accrues on the entire debt or only on the monthly payments past due;
8. Whether the debtor's obligation of payment terminates on the death or remarriage of the recipient, or on the death of the debtor.

*In re Combs*, 101 B.R. at 616 (citations omitted). Along with these factors, the court should generally "consider the surrounding circumstances and all other relevant incidents bearing on the parties' intent." *Id.* Yet, in determining intent, the court must only considers "intention of the parties at the time they entered into their [marital settlement agreement], and not the current circumstances of the parties." *Id.* at 615 (citations omitted).

   *1. The Evidence Establishes that McFadden Needed Spousal Support at the Time of Divorce.*

First and foremost, the court "should consider whether the recipient spouse actually needed spousal support at the time of the divorce." *Friedkin v. Sternberg (In re Sternberg)*, 85 F.3d 1400, 1405 (9th Cir. 1996), *overruled on other grounds by Murray v. Bammer (In re Bammer)*, 131 F.3d 788 (9th Cir. 1997). "Factors indicating that support is necessary include the presence of minor children and an imbalance in the relative income of the parties." *Shaver*, 736 F.2d at 1316 (citation omitted).

Here, the relevant facts about the parties show that McFadden truly needed support at the time of the divorce. Putnam was a businessman operating his own business, Putnam Financial. The business was described as being "always profitable," but the parties agreed that the income from the business fluctuated month to month, sometimes reaching $5,000 in some months but

24

1  averaging around $3,000. Additionally, his personal expenses were being covered by the

2  business.

3      In contrast, no evidence was presented as to McFadden's income-earning power, but

4  several facts tend to show that there was an imbalance at the time of the dissolution. First,

5  McFadden had primary custody of the parties' two minor children, and she maintained a

6  household size of three except for when the children visited their father. Meanwhile, Putnam, for

7  the most part, maintained a household of one. Also, pursuant to the Dissolution Judgment,

8  Putnam was required to make monthly payments for child support and spousal support to

9  McFadden and their children, indicating that she did not have income as high as his. Given the

10 inequality in income, the presence of minors in McFadden's household, and the existence of

11 spousal and child support payments under the Dissolution Judgment, this factor of need weighs

12 in favor of McFadden.

13     The court now moves onto the other relevant factors. But because the lease, down

14 payment, and attorney's fees obligations involve different sets of facts and circumstances, the

15 court takes an individual look into each obligation to determine if it was in the nature of

16 support.[28]

17     *2.  The Lease Obligation Was Intended as Support.*

18     Beginning with the lease obligation, the court first looks to the labels given to and the

19 placement of the lease obligation in the Second Incorporated MSA. This obligation appeared

20 under the "Child and Spousal Support" section of the document, indicating support debt.

21 However, the parties titled this document as "Stipulation and Order for Entry of Judgment on

22 Child Support, Spousal Support, Child Custody, Child Visitation and *Disposition of Petitioner's*

23 *Vehicle*." By separately identifying the vehicle issue in the title, this may demonstrate that the

24 parties intended the vehicle issue to be separate from the support issues. The labels and

25

26 ────────────────

[28] In determining which obligations are in the nature of support, the court looks to the original obligations

27 owed to third-party creditors, which were intended to indirectly benefit McFadden. *See Shaver*, 736 F.2d

at 1317 (stating that debts intended as support under § 523(a)(5) may be in the form of direct or indirect

28 support to the spouse).

1 │ placement do not express a clear intention.

2 │      Turning to the manner of payment, it appears at first that the lease obligation is not in the

3 │ nature of support.  Though the lease requires monthly installment payments, indicating support,

4 │ the payments do not terminate on McFadden's death or remarriage.  Instead, the payments are set

5 │ to terminate on a specific date, October 2010, when the lease expires.  This suggests a finding of

6 │ non-support.  However, the court believes such an interpretation to be too narrow and instead

7 │ views the lease obligation as part of a grander scheme of spousal support as outlined in the

8 │ Second Incorporated MSA.  Upon the expiration of the lease, Putnam no longer has to make the

9 │ monthly lease payments, but he then becomes obligated to make spousal support payments of

10 │ $750 a month.  Though the amount and the payee may differ, the lease payments are still part of a

11 │ continuous flow or schedule of monthly payments to McFadden that does not have an established

12 │ termination date.

13 │      Even the language in the Second Incorporated MSA regarding the relationship between

14 │ the lease payments and spousal support payments reinforces a finding of support.  The relevant

15 │ provision states, "*In lieu of spousal support* at this time, Respondent [Putnam] is also ordered to

16 │ pay Petitioner's [McFadden's] Denali automobile lease payments."  While the term "in lieu of

17 │ spousal support" could indicate an intention to forego any kind of support payments, one

18 │ California court has rejected such an interpretation.  That court provided the following

19 │ explanation:

20 │     [A]lthough the phrase "in lieu of spousal support" would appear ambiguous to
   │     one who is unfamiliar with the practice of family law, it is a term of art commonly
21 │     used by family law courts and practitioners to describe a spousal support award
   │     comprised of payments other than cash to the supported spouse.  Common sense
22 │     leads to the conclusion that the court would not have used this term unless the
   │     court meant the award to be a spousal support order . . . .  By its very nature, the
23 │     term presupposes a spousal support obligation.

24 │ *In re Marriage of Garcia*, 224 Cal. App. 3d 885, 894–95 (1990).  Given that the parties were

25 │ represented by attorneys in their dissolution, the use of "in lieu of spousal support" when

26 │ referring to the lease obligation supports a finding of support.

27 │      Lastly, in addition to the context of the lease payments within the Second Incorporated

28 │ MSA, the court finds that the substance of the lease obligation is determinative on the issue as

well. Looking to the substance, it is not simply Putnam's obligation to pay off a prior community debt. Rather, the lease obligation represents Putnam providing McFadden with a necessity of life, namely, a vehicle of transportation. *Cf. id.* at 892 (stating that "if [a] wife is living in the family residence and the husband is not, an order requiring the husband to pay all or part of the monthly mortgage is justifiable as spousal support because it meets the wife's need for housing"). By requiring Putnam to continue making lease payments, this allowed McFadden to continue using the Denali for her daily routine and activities. Taking into account the fact that she had custody of their two children, Putnam's lease obligation is clearly related to a necessity of life and thus in the nature of support.

### 3. The Down Payment Obligation Was Intended as Support.

Next, turning to the Putnam's down payment obligation, the court also finds that, similar to the lease, the factors weigh in favor of finding the obligation in the nature of support. The strongest support against a finding of support is the parties' placement of the obligation under the "Property Division" section of the First Incorporated MSA and the fact that the obligation is a one-time, lump-sum payment of $2,200 to McFadden. But once again, looking to the substance of the obligation, the court finds that the down payment assistance for McFadden to purchase a vehicle was intended to provide her with a necessity of life. This must also be combined with the fact McFadden has primary custody of two minor children, further supporting the conclusion that this was related to a necessity of life and intended as support.

### 4. The Attorney's Fees Obligation Was Intended as Support.

The court now considers whether Putnam's obligation to pay Putnam's attorney's fees is in the nature of support. An obligation to pay attorney's fees has been construed as being both support and non-support depending on the factual circumstances of the case. *Compare Gionis v. Wayne (In re Gionis)*, 170 B.R. 675, 683–84 (B.A.P. 9th Cir. 1994) (concluding that attorney's fees obligation was in nature of support), *aff'd*, 92 F.3d 1192 (9th Cir. 1996) (unpublished table decision), *with Gard v. Gibson (In re Gibson)*, 103 B.R. 218, 221 (B.A.P. 9th Cir. 1989) (concluding that attorney's fees obligation was not in nature of support). Thus, the court must look closely at the relevant facts.

27

1    The attorney's fees obligation is set forth in the "General Provisions" section of the First

2    Incorporated MSA, rather than in the property division or spousal support section.  This

3    placement offers nothing about the parties' intention.  Examining the MSA, it also provides very

4    little about the attorney's fees obligation; the relevant provision simply adopts the December

5    Interim Order that originally ordered Putnam to pay the attorney's fees to Bruder.  Then, turning

6    to the December Interim Order, the court also comes up empty.  In the order, the State Court did

7    not explain its basis for assigning Putnam that obligation.  The State Court does reference

8    declarations in support of McFadden's request for attorney's fees in the December Interim Order,

9    but the parties did not introduce those declarations as evidence in this proceeding.

10    The court then considers the manner of payment.  Pursuant to the December Interim

11    Order, Putnam was ordered to pay $2,500 in December 2009, and then make a monthly $500

12    payment until the $10,000 amount was paid in full.  Since Putnam's attorney's fees obligation

13    was set to terminate in March 2009 when the last $500 payment was due, this initially shows

14    signs that the obligation is not in the nature of support.  The monthly payments were set to end

15    due to full payment of the obligation, rather than due to McFadden's death or remarriage.

16    However, once again, the court sees this narrow interpretation as failing to see the bigger picture.

17    Pursuant to the First Incorporated MSA, upon satisfaction of the attorney's fees obligation,

18    Putnam was then obligated to "pay one-half of the total costs of tuition for the children's

19    continued attendance at St. Paul's School."  This tuition obligation may be considered a form of

20    a support obligation.  *See Seixas v. Booth (In re Seixas)*, 239 B.R. 398, 403 (B.A.P. 9th Cir.

21    1999).  If such, then the monthly payments of attorney's fees are also a part of a continuous flow

22    of support obligations with no set termination date.  Due to this, the court finds that the

23    attorney's fees obligation is in the nature of support.

24    McFadden has sufficiently established that the three debts are in the nature of support,

25    satisfying the last requisite element of § 523(a)(5).  Having met her burden under § 523(a)(5), the

26    court finds that the Lease Debt, the Down Payment Debt, and the Attorney's Fees Debt are

27    nondischargeable but only to the extent that the debts ultimately represent Putnam's obligation to

28    pay McFadden, if any, rather than to third-party creditors.

28

D. <u>The Hold-Harmless Debt Is Nondischargeable Under § 523(a)(15)</u>.

Next, the court considers whether the Hold-Harmless Debt is nondischargeable under § 523(a)(15), as a property settlement obligation. To meet her burden of proof under this subsection, a creditor must establish three elements: (1) the debt is owed to a former spouse of the debtor; (2) the debt is not a support obligation within meaning of § 523(a)(5); and (3) the debt was incurred in the course of a divorce or separation or in connection with a separation agreement, divorce decree, or other order of a court of record. *Lewis v. Lewis (In re Lewis)*, 423 B.R. 742, 750–51 (Bankr. W.D. Mich. 2010); *Damschroeder v. Williams (In re Williams)*, 398 B.R. 464, 468 (Bankr. N.D. Ohio 2008); *see also Wodark*, 425 B.R. at 837–38 (focusing § 523(a)(15) determination only on "(1) the nature of the debt; and (2) whether the debt was incurred in the course of a divorce or separation"). Upon careful examination, the court finds that McFadden has sufficiently met her burden in proving the three elements of § 523(a)(15).

Again, given the court's clarification of the claims subject to this proceeding above, the first element, that the debt be owed to a former spouse, has been easily met. As extensively discussed above, the court is not deciding whether Putnam's obligation to pay the family loan to Steven is nondischargeable. Instead, the court only considers Putnam's obligation arising from the hold-harmless provision in the First Incorporated MSA. Specifically, under this provision, Putnam agreed to hold McFadden harmless from any liability on the family loan, a community debt assigned only to Putnam under the Dissolution Judgment. Because Putnam is obligated to indemnify McFadden, this is clearly a debt owed to McFadden, the former spouse of the debtor.

For the second element, McFadden has adequately proven that the Hold-Harmless Debt is not a domestic support obligation; instead, it resembles more of a property settlement obligation. Looking at the underlying debt, the family loan from Steven does not bear the characteristics of support. The parties did not incur this debt for any necessities of life; rather, the parties described the loan in the First Incorporated MSA as a "business debt" associated with Putnam's business dealings. Additionally, this obligation was a past community debt, mentioned under the property division section of the First Incorporated MSA, and then voluntarily assumed by Putnam as his sole and separate debt. These factors seem to indicate that the underlying debt is

29

1  not in the nature of support.

2          Further, the relevant legislative history also supports a finding that the Hold-Harmless

3  Debt, the obligation owed to McFadden, represents precisely the kind of debts intended to be

4  nondischargeable under § 523(a)(15).  The legislative history states, in relevant part,

5          "The exception [to discharge in section 523(a)(15)] applies only to debts incurred
           in a divorce or separation that are owed to a spouse or former spouse, and can be
6          asserted only by the other party to the divorce or separation . . . .  It is only the
           obligation owed to the spouse or former spouse—*an obligation to hold the spouse*
7          *or former spouse harmless*—which is within the scope of this section."

8  *Ashton v. Dollaga (In re Dollaga)*, 260 B.R. 493, 496 (B.A.P. 9th Cir. 2001) (alterations in

9  original) (emphasis added) (quoting H.R. Rep. No. 103-835, at 55 (1994)).  Thus, Putnam's hold-

10 harmless obligation to McFadden falls squarely within the scope of § 523(a)(15).  *See Wodark*,

11 425 B.R. at 837 (noting that an express hold-harmless provision "create[s] direct liability from

12 the debtor to the former spouse"); *Montgomery*, 310 B.R. at 180.

13         As to the last element, McFadden has also met her burden.  A debt constitutes a debt

14 incurred in connection with a divorce decree or separation agreement when it has been

15 specifically incorporated into such divorce decree or separation agreement.  *Short v. Short (In re*

16 *Short)*, 232 F.3d 1018, 1023 (9th Cir. 2000) (citing *In re Crosswhite*, 148 F.3d 879, 881–82 (7th

17 Cir. 1998) (holding that husband's debt to wife was nondischargeable where husband agreed to

18 assume debt under terms of divorce agreement)).  Here, not only was Putnam's obligation to hold

19 McFadden harmless specifically mentioned in the Dissolution Judgment, but this obligation did

20 not exist until the Dissolution Judgment.  Before the dissolution of their marriage, Putnam never

21 owed McFadden a duty to indemnify her from liability on the family loan.  Rather, as the parties

22 indicated in the First Incorporated MSA, this was a community debt that both parties had

23 liability.  Upon entry of the Dissolution Judgment, Putnam incurred a new obligation to

24 McFadden, this hold-harmless obligation.

25         McFadden has met her burden in establishing the three elements of § 523(a)(15).

26 Accordingly, the court finds that the Hold-Harmless Debt, to the extent it represents an

27 obligation owed to McFadden, is nondischargeable.

28

                                          30

1    E.   McFadden's Nondischargeability Claim Relating to the Hold-Harmless Debt Is Not

2         Barred by the Doctrine of Claim Preclusion.

3         Having found that the four debts at issue in this action are nondischargeable, the court

4    now considers Putnam's defenses.  His first defense is the doctrine of claim preclusion, which he

5    argues bars McFadden from litigating her claim that the Hold-Harmless Debt is

6    nondischargeable.

7         Claim preclusion, otherwise referred to as res judicata, provides that a final judgment on

8    the merits of an action precludes the parties from relitigating all issues that were or could have

9    been raised in that action.  *In re Baker*, 74 F.3d 906, 910 (9th Cir. 1996) (citing *Federated Dep't*

10   *Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).  The doctrine is applicable in a subsequent

11   action when the following four elements have been met: (1) the parties are identical or in privity;

12   (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) there

13   was a final judgment on the merits; and (4) the identical claim or cause of action was involved in

14   both suits.  *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001).

15        Putnam contends that his successful motion to dismiss, which was granted in Steven's

16   adversary proceeding as to the $15,000 debt owed to him, precludes McFadden litigating the

17   nondischargeability of the Hold-Harmless Debt in this proceeding.

18        The court disagrees for several reasons.  First, by referencing the order and findings

19   entered by the court in Steven's adversary proceeding,[29] Putnam is essentially asking that this

20   court take judicial notice of these two documents.  However, he has not met the requisite burden

21   for the court to take judicial notice.  "It is well established that a court may take judicial notice of

22   its own records."  *In re Blumer*, 95 B.R. 143, 146 (B.A.P. 9th Cir. 1988) (citations omitted).

23   Nevertheless, a party requesting judicial notice bears the burden of persuading the court that the

24   fact is a proper matter for judicial notice.  *In re Tyrone F. Conner Corp.*, 140 B.R. 771, 781

25   (Bankr. E.D. Cal. 1992).  To sustain this burden, the party must "(1) persuade the court that eh

26   _____

27   [29] *See* Order Regarding Motion to Dismiss Complaint, *McFadden II*, Case No. 10-19719-A-7, Adv. No.
     10-01276-A, ECF No. 31; Findings of Fact and Conclusions of Law Regarding Motions to Dismiss
28   Complaint, *McFadden II*, Case No. 10-19719-A-7, Adv. No. 10-01276-A, ECF No. 30.

1    particular fact is not reasonably subject to dispute and is capable of immediate and accurate

2    determination by resort to a source 'whose accuracy cannot reasonably be questioned' and (2)

3    must also *supply the court with the source material needed to determine whether the request is*

4    *justified.*" *Id.* (emphasis in original). In this case, Putnam has never offered the court with the

5    necessary source material, which provides the basis for his claim preclusion defense.

6         Alternatively, even if the court were to take judicial notice of these documents, the court

7    finds that Putnam has not met the third and fourth elements of claim preclusion. Here, there has

8    not been a final judgment on the merits. The court dismissed Steven's complaint for lack of

9    standing for both his § 523(a)(5) and § 523(a)(15) claims.[30] A dismissal for lack of standing is

10   not an adjudication on the merits. *Media Techs. Licensing Co. v. The Upper Deck,* 334 F.3d

11   1366, 1370 (Fed. Cir. 2003); *Bird v. Lewis & Clark Coll.,* 303 F.3d 1015, 1019 (9th Cir. 2002).

12        Lastly, and most importantly, there has been no identity of the claims. To determine

13   whether two claims are the same for claim preclusion purposes, the Ninth Circuit has established

14   the following criteria:

15        (1) whether rights or interests established in the prior judgment would be
          destroyed or impaired by prosecution of the second action;
16        (2) whether substantially the same evidence is presented in the two actions;
          (3) whether the two suits involve infringement of the same right; and
17        (4) whether the two suits arise out of the same transactional nucleus of facts.

18   *Nordhorn v. Ladish Co.,* 9 F.3d 1402, 1405 (9th Cir. 1993) (citations omitted). Here, though

19   their claims relate to the same nucleus of fact, namely the portion of the Dissolution Judgment

20   relating to the family loan obligation, the claims sought to be nondischargeable by Steven and

21   McFadden represent two different claims. Steven's claim was Putnam's obligation to him to

22   repay the $15,000 family loan assigned under the Dissolution. In contrast, McFadden's claim in

23   this proceeding is her claim against Putnam to be held harmless from any liability on that family

24   loan obligation. As discussed above, these represent two separate debts. *See In re Heilman,* 430

25   B.R. at 223 (Pappas, J., dissenting) (citations omitted). Since McFadden and Steven have two

26

27   ─────────────────────────

28   [30] *See* Findings of Fact and Conclusions of Law Regarding Motions to Dismiss Complaint at 3–4,
     *McFadden II,* Case No. 10-19719-A-7, Adv. No. 10-01276-A, ECF No. 30.

32

separate debts that wished to be determined nondischargeable, they do not share the same claim for purposes of claim preclusion.

For these reasons, McFadden's claim that the Hold-Harmless Debt is nondischargeable is not barred by the doctrine of claim preclusion.

F.  McFadden's Nondischargeability Claims Are Not Barred by the Doctrine of Unclean Hands.

Lastly, the court considers Putnam's defense of unclean hands, arguing that the doctrine prevents McFadden from bringing a nondischargeability action against him entirely.  The doctrine of unclean hands "closes the doors of a court of equity to [a party] tainted with inequitableness or bad faith relative to the matter in which he seeks relief." *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  The party must have "acted fairly and without fraud or deceit as to the controversy in issue." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (internal quotation marks omitted).  However, unclean hands do not constitute "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense." *Republic Molding Corp. v. B.W. Photo Utils.*, 319 F.2d 347, 349 (9th Cir. 1963).

In appropriate cases, the unclean hands doctrine is a defense to a § 523 action. *See Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 810 (4th Cir. 2001); *Hopper v. Everett (In re Everett)*, 364 B.R. 711, 723–24 (Bankr. D. Ariz. 2007); *Christen v. Himber (In re Himber)*, 296 B.R. 217, 223–24 (Bankr. C.D. Cal. 2002).  Yet, to invoke the doctrine, there must be "a close nexus between a party's unethical conduct and the transactions on which that party seeks relief." *Uwimana*, 274 F.3d at 810 (citing *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

Putnam argues that McFadden's hands are unclean, citing first, her misrepresentations to the State Court that Putnam had not paid any of his attorney's fees obligation, when he had actually paid $3,500, and second, McFadden's execution of the vehicle finance agreement using her father's name.  These actions, he believes, are sufficient to preclude her from prosecuting this nondischargeability action.

Though less than fully forthright, the court finds that McFadden's actions did not rise to

1    the level of bad faith or fraudulent conduct required to invoke the doctrine of unclean hands.

2    First, the misrepresentations to the State Court may be explained by something other than

3    nefarious motives, including lack of knowledge or an imperfect memory.  While Putnam had not

4    completely ignored his obligation to pay attorney's fees, he still nevertheless failed to pay a

5    substantial part of that obligation.  Second, as to the circumstances surrounding the vehicle

6    finance agreement, this "bad act" has no relation to the Lease, Attorney's Fees, or Hold Harmless

7    Debt.  It is also too attenuated from the Down Payment Debt, as it primarily affects the vehicle

8    lender, not Putnam.   Thus, the doctrine of unclean hands does not bar relief in this instance.

9    **VI.    CONCLUSION.**

10           For the reasons stated above, the court finds in favor of McFadden on her claims for relief

11    pleaded in the first amended complaint.[31]  Specifically, the court finds that any potential rights to

12    payment or repayment flowing from Putnam's breach of the lease, the down payment, and the

13    attorney's fees obligations under the Dissolution Judgment are nondischargeable under §

14    523(a)(5), but only to the extent that these debts represent an actual obligation to pay McFadden,

15    as to be determined by the State Court at the appropriate time.  Further, the court finds that any

16    potential payment rights to McFadden, which arises out of Putnam's express obligation to hold

17    McFadden harmless from any liability on the family loan debt under the Dissolution Judgment,

18    are nondischargeable under § 523(a)(15), but only to the extent this debt represents an actual

19    obligation to pay McFadden.  Because these debts have been declared nondischargeable,

20    McFadden is free to pursue any necessary action against Putnam on these debts in the State Court

21    without violating the discharge injunction.

22

23

24

25

26

27   [31] In his post-trial brief, Putnam believes that McFadden is seeking attorney's fees in this adversary
     proceeding.  However, no such request was made by McFadden, either in her post-trial brief or her first
28   amended complaint.  Accordingly, this court will not consider this issue.

1    McFadden shall prepare and lodge an order and judgment consistent with the findings

2    herein.  Because the court declines to fix the amount of the nondischargeable debts subject to this

3    action, the judgment shall be styled in the nature of declaratory relief, and not for monetary

4    damages.

5

6

7    Dated: August _____ , 2012

8

9                                                   Fredrick E. Clement
                                                    United States Bankruptcy Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  service list:

2  John P. Bianco, Esq.
   118 E. Oak St., #225
3  P. O. Box 1088
   Visalia, CA 93279-1088

4

   Scott Lyons, Esq.
5  1010 W. Main St.
   Visalia, A 93291

6
   Office of the U. S. Trustee
7  U. S. Courthouse
   2500 Tulare Street, Room 1401
8  Fresno, CA 93721

9  Robert A. Hawkins
   Chapter 7 Trustee
10 1849 N. Helm, #101
   Fresno, CA 93727

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

36